## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARIA DE LA CRUZ MAGOWAN,<br><br>Plaintiff,<br><br>v.<br><br>BRIGID D. LOWERY,<br><br>Defendant. | Civil Action No. 15-917 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiff, Maria De La Cruz Magowan, proceeding *pro se*, initiated this action on June 3, 2015, in the Superior Court for the District of Columbia ("D.C. Superior Court") against the defendant Brigid D. Lowery, who is the plaintiff's current federal workplace supervisor at the United States Environmental Protection Agency ("EPA"), alleging that the defendant has verbally and physically harassed and abused her for over five years, *see* Compl., Superior Court Record ("SCR") at 29, ECF No. 6-1, and requesting an order prohibiting the defendant from having "<u>any</u> kind of contact" with her, as well as $300,000 in damages, Mot. for PI ("Pl.'s Sup. Ct. PI Mot.") (emphasis in original), SCR at 25; Mot. for TRO ("Pl.'s Sup. Ct. TRO Mot.") (emphasis in original), SCR at 27; *see also* Compl. Pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2),[1] upon certification by the United States Attorney's Office for the District of Columbia that the defendant was acting within the scope of her employment as a United States

---

[1] "When a federal employee is sued for wrongful or negligent conduct, the [Westfall] Act empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose.' Upon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee." *Wuterich v. Murtha*, 562 F.3d 375, 377 (D.C. Cir. 2009) (quoting *Osborn v. Haley*, 549 U.S. 225, 229–30 (2007) (citing 28 U.S.C. § 2679(d)(1), (2))). Then, "[t]he United States . . . must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his [or her] employment." *Osborn*, 549 U.S. at 231 (emphasis in original).

employee at the time of the incidents alleged in the complaint, the case was removed to this Court and the United States was substituted as the defendant. Notice of Removal of a Civil Action ("Not. of Removal"), ECF No. 1; *id.*, Ex. 2 ("Certification"), ECF No. 1-2. On July 27, 2015, the plaintiff's requests to remand the case to Superior Court and for "immediate protection from Brigid D. Lowery" were denied. Order ("July 27, 2015 Order"), ECF No. 10. Pending before the Court is the defendant's Motion to Dismiss Plaintiff's Complaint Against Brigid Lowery and the United States and Opposition to Plaintiff's Motion for Temporary Restraining Order ("Def.'s Mot."), ECF No. 4. For the reasons set forth below, the motion is granted.

## I.   BACKGROUND

At the outset, the Court notes that the record on this motion to dismiss is fairly extensive. The plaintiff has submitted numerous documents with her various filings, including 173-pages of exhibits attached to her motion for remand and renewed request for "immediate protection," *see* Pl.'s Mot. Remand Case Sup. Ct. D.C. Civil Division and/or Req. Ct. Order U.S. EPA Provide Immediate Protection Pl. From Def. Brigid D. Lowery & Pay Pl. Damages ("Pl.'s Opp'n"), Exs. A–X, ECF No. 8-1; an additional ten pages of exhibits attached to her response to an order of the Court, *see* Pl.'s Notification That Her Previous Resp., Filing ECF No. 8 Was Not Sufficient & Pl.'s Intent File Further Arguments Resp. Def.'s Mot. Dismiss Case, ECF No. 4, & Other Opp'ns Ordered by Ct. ("Pl.'s Suppl. Opp'n"), Exs. A–C, ECF No. 11; and an additional thirty pages of exhibits attached to a supplemental reply, *see* Pl.'s Reply Def.'s Suppl. Reply Supp. Mot. Dismiss Pl.'s Compl. Against Brigid Lowery & Opp'n Pl.'s Mot. TRO ("Pl.'s Reply"), Exs. A– B, ECF No. 13. While generally motions to dismiss for failure to state a claim are resolved based on consideration only of "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice," *Mpoy v.*

*Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)), when, as here, the plaintiff is proceeding *pro se*, any additional exhibits, "including those in . . . opposition to . . . [a defendant's] motion to dismiss," must be considered in construing the sufficiency of the plaintiff's claims, *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015); *see also id.* (reversing dismissal order where district court did not consider "the facts alleged in *all* of [the plaintiff's] pleadings" (emphasis in original)).  The relevant facts distilled from this record are summarized below before turning to the procedural history of this case.

### A.     Factual Background

The plaintiff "is a 61 year old Hispanic Economist, with 40 years of professional experience in her field."  Pl.'s Opp'n at 3, ECF No. 8.  A native of Bolivia, the plaintiff became a United States citizen in August 1986 and began working for the EPA in 1990.  *Id.*; *id.*, Ex. A ("Pl.'s Resume") at 1–2.  In 1999, she began working in the EPA's Office of Solid Waste and Emergency Response ("OSWER"), where she continues to work as a federal employee.  Pl.'s Opp'n at 3; Pl.'s Resume at 1.

The plaintiff avers that she is a "whistleblower, who made a Disclosure to the Office of the Inspector General (["]OIG["]) around April 2003."  Pl.'s Opp'n at 3.  Specifically, the plaintiff claims that, in April 2003, she disclosed irregularities in contracts of OWSER's Office of Underground Storage Tanks ("OUST") to the OIG, which issued a report a year later confirming the plaintiff's assertions.  *Id.* at 4; *see also id.*, Ex. B. at 1–2 (March 31, 2004 OIG report citing receipt of a "hotline complaint" regarding OUST's "financial management" prompting "a review to determine the validity of the allegations" which "found OUST had inappropriately used and inefficiently managed contract funds").  As a result, the plaintiff alleges

that she "suffer[ed] immediate retaliation in OSWER that continued for four" years until, in April 2007, she reached a settlement agreement with the EPA. *Id.* at 4. Shortly after the settlement, however, in July 2007, the plaintiff asserts that the agency began a sexual harassment investigation related to her previous whistleblowing. *Id.*; *see also id.*, Ex. C (related attorney correspondence). The plaintiff alleges that, "[a]t that point, the retaliation re-started and continues to this day." *Id.* at 5 (emphasis omitted).

In December 2007, the plaintiff accepted "a detail that later became permanent to do economic analysis" in OWSER's Office of the Center of Program Analysis ("OCPA"), headed by Director Edward Chu. *Id.* When Chu left his position a year later, in December 2008, the defendant Brigid D. Lowery replaced him and became the plaintiff's supervisor. *Id.* The defendant currently remains the plaintiff's supervisor. *See* Compl.

The plaintiff alleges that "since 2010," the defendant "has been bullying [her] in all sorts of manners, including physical," Compl., and claims that she "fears for her safety and her life," Pl.'s Opp'n at 3; *see also* Compl. The plaintiff alleges three main incidents with her supervisor underlying her claims of retaliatory and discriminatory conduct. These incidents are described below.

### 1.  *June or July 2010 Telephone-Throwing Incident*

The earliest incident allegedly occurred in June or July 2010, at a morning meeting in the defendant's office, when the defendant "violently threw" a telephone at the plaintiff, yelled at the plaintiff and called her "so stupid." Pl.'s Opp'n at 5; *see also* Compl. A few days later, the plaintiff met with a union representative, Theresa Fleming-Blue, about the alleged incident. Pl.'s Opp'n at 6; *id.*, Ex. D, Decl. of Theresa Fleming-Blue (July 9, 2015) ("Fleming-Blue Decl.") ¶ 2. Fleming-Blue states that she then met with the defendant, who "denied that she had committed these acts." Fleming-Blue Decl. ¶ 6.

The plaintiff claims that the defendant retaliated against her in three ways for reporting the phone-throwing incident to the union.  First, the plaintiff alleges that the defendant prevented the plaintiff from obtaining a promotion by rewriting the plaintiff's job classification to eliminate the plaintiff's GS-15 promotion potential.  Pl.'s Opp'n at 7; *see also id.*, Ex. O at 16 ("Notification of Personnel Action" indicating that, on May 13, 2007 a "Human Resources Specialist" changed the plaintiff's "Position Title" from "Lead Program Analyst" to "Program Analyst" "at the full performance level").  The plaintiff also alleges that the defendant spoke ill of the plaintiff, thereby preventing the plaintiff from obtaining a GS-15 level position in the EPA "or any other place in the Government," even though the plaintiff was "certified as 'Best Qualified' and . . . interviewed" for many positions.  *Id.* at 7; *see also id.*, Ex. H (sixteen "thank you" emails sent by the plaintiff to various interviewers on various dates between February 13, 2006 and November 30, 2010).  According to the plaintiff, even though "[p]otential employers . . . seemed very enthusiastic with [her] qualifications after interviewing and talking to [her]," the employers then "retracted their decisions" upon speaking with the defendant.  *Id.* at 7.

Relatedly, the plaintiff makes a blanket assertion that the EPA has prevented her from "hold[ing] a GS-15 grade" and becoming a supervisor, and, by extension, denying her "any right to work in a safe environment," because "according to OWSER's own statistics, Plaintiff does not have the one 'skill' needed to become a GS-15:  Being White."  *Id.* at 12 (emphasis omitted). To support this assertion, the plaintiff provides what appears to be an EPA booklet or presentation titled, "OWSER DEMOGRAPHICS Fiscal Year 2013," which contains demographic data about employee promotions and indicates that only white employees received grade 15 promotions between 2010 and 2013.  *See id.*, Ex. U at 1, 10.  The plaintiff further explains that "[i]n OWSER the very few minorities holding a GS-15 level came already with that

level or earned that level before or around a decade ago." *Id.* at 12; *see also id.* ("In Plaintiff's work place (OWSER) a Supervisor must hold a GS-15 grade, but unfortunately, according to statistics provided by OSWER only white employees have been allowed to be promoted to the GS-15 level at least since FY 2010.").

Second, the plaintiff alleges that the defendant unreasonably and wrongfully denied her sick leave. In support of this allegation, the plaintiff asserts that, in September 2010, the defendant denied her request for "two day annual leave" to go to New York to see her brother, whom she had not seen in six years. *Id.* at 7–8. The defendant allegedly "denied the leave" because "there was too much work to do, in spite of the fact that the work was almost done" and the fact that the plaintiff had obtained back-up coverage from a colleague. *Id.* As a result, the plaintiff alleges that she became ill and had to take some time off from work. *Id.*; *see also id.*, Ex. I (doctor's note indicating that the plaintiff "was seen" on September 2 and 29, 2010). The plaintiff alleges that, despite giving the plaintiff permission to leave work "verbally and by email" on September 30, 2010, *id.* at 8; *see also id.*, Ex. J (September 30, 2010 email from the defendant to the plaintiff "approv[ing] your request for 6 hours leave from 10 – 4" and stating "I hope you feel better"), and knowing that a specialist was not available to see the plaintiff about her illness until November 9, 2010, *see id.* at 8; *see also id.*, Ex. K (Johns Hopkins Medicine appointment reminder letter for November 9, 2010 doctor's appointment), the defendant asked the plaintiff to submit a certain kind of doctor's note for her absences, which the plaintiff alleges was "an impossibility" and against EPA policy, *id.* at 8–9; *see also id.*, Ex. O at 14–15 (provision of April 1, 2007 collective bargaining agreement between EPA and American Federation of Government Employees ("AFGE" or "union") indicating that employees are not required to submit doctor's notes for sick leave periods of three consecutive days or less).

Additionally, the plaintiff alleges that she requested sick leave from the defendant for a necessary medical procedure scheduled for December 2, 2010, *id.* at 8; *see also id.*, Ex. L (Johns Hopkins Medicine letter confirming November 19, 2010 pre-operative examination and December 2, 2010 surgery appointments), and that the defendant "refused and threatened Plaintiff with AWOL had she dared to take Sick Leave," and told the plaintiff that she, the defendant, "would request a waiver from the Agency to prevent Plaintiff from taking any leave in 2010," *id.* at 8–9. As a result, the plaintiff alleges that she did not have the medical procedure, that her doctor asked her "to look for another doctor due to her refusal to follow recommended treatment," and that she "is still suffering from those symptoms." *Id.* at 8.

Moreover, the plaintiff alleges that, at the end of January 2011, "hours before" the defendant took "a 20-day vacation overseas," the defendant changed fifteen hours of the plaintiff's sick leave from September 30, 2010 and October 1, 2010, "into AWOL," forcing the plaintiff "to pay . . . money back to the U.S. Treasury," *id.* at 9; *see also id.*, Ex. M at 4–5 (January 29, 2011 letter from a federal debt processing agency to the plaintiff about "[a]n overpayment . . . on your pay account for pay period ending October 9, 2010" in the amount of $559.53); *id.*, Ex. O at 12 (February 2, 2011 email from union representative to Barry Breen, the defendant's supervisor, "concern[ing] the unilateral time and attendance change Ms. Brigid Lowery recently made, without giving notice to Ms. MaGowan prompting DFAS to request immediate payment of $559.53 from Ms. MaGowan"), and causing the plaintiff to, for the first time, receive "a negative mark in her career of over 25 years in [the] EPA," *id.* at 9.

Fleming-Blue, the union representative, without any explanation of how she acquired personal knowledge, echoes the plaintiff's assertions, attesting that in the months following the phone-throwing incident, "Ms. Lowery retaliated against Ms. MaGowan for seeking assistance

from the union," by (1) rewriting the plaintiff's job classification to deny her promotion potential

and (2) instructing the plaintiff to take sick leave but then denying the sick leave and changing

the plaintiff's records to "reflect [the plaintiff] being AWOL for that period of time," thereby

causing the plaintiff to "pa[y] back the Federal Government" approximately $1000.  Fleming-

Blue Decl. ¶ 7.

 The plaintiff apparently filed a complaint with the Merit Systems Protection Board

("MSPB") for the defendant's wrongful denial of sick leave, *see* Pl.'s Opp'n at 8–9, but alleges

that "to date, the Agency still has not done anything to resolve this issue," *id.* at 9.

 Lastly, the plaintiff makes a cursory allegation that, "after one of the confrontational

events coming from Brigid Lowery in 2010," "the windshield of [the plaintiff's] car (parked

outside her condominium) [was] intentionally cracked while she was sleeping."  *Id.* at 12; *see

also id.*, Ex. V (customer receipt with illegible date stamp from "Safelite AutoGlass" for

payment of $250).  Since "Brigid Lowery knows where Plaintiff lives and knows Plaintiff's car,"

the plaintiff suggests that the defendant committed or caused the vandalism.  *Id.* at 13.

### 2. *November 21, 2014 Physical Fight-Attempt Incident*

 The plaintiff alleges that on Friday, November 21, 2014, the defendant, who "looked very

upset," "ordered Plaintiff to go with her to [the defendant's] office immediately."  *Id.* at 6.  Once

the two were in the defendant's office, the defendant allegedly "started yelling" at the plaintiff,

"invading [the plaintiff's] personal space," and "waving her hands very close to Plaintiff's face."

*Id*.  After the plaintiff asked the defendant "to move back and told her that she was frightening

[the plaintiff,]" the defendant allegedly asked the plaintiff "if [the plaintiff] preferred to deal with

it outside [the defendant's] office."  *Id*.  The defendant then allegedly walked by the plaintiff to

stand outside the office, "roll[ed] up her sleeves and extended her arms toward Plaintiff in a

'fighting position,'" "bent her knees in a 'crunching' way and signaled [to the] Plaintiff to go

ahead and fight her physically." *Id.* The plaintiff claims that, in response, she told the defendant "that she was afraid of her, turned around as fast as she could and left" the area. *Id.* The plaintiff alleges that two co-workers working in the area at the time, Nick Hilosky and Marc Thomas, witnessed the incident. *Id.*

The afternoon after the incident, the plaintiff sent an email to the defendant, copying the defendant's supervisor, Barry Breen, OSWER's Deputy Assistant Administrator. *See id.*, Ex. E at 1–2; *id.*, Ex. F at 1. In the email, the plaintiff accuses the defendant of committing, aside from the "physical bullying," a laundry list of work-related wrongful conduct, including: giving the plaintiff an increasingly heavy workload; "stopping by my cubicle 1 to 5 minutes before [her] time to leave with 'emergencies' that do not exist and 'must' . . . be finished[;]" "[f]alsely accusing me of 'errors' not actually made or even worse created by you[;]" "[d]isregarding satisfactory or even creative, analytical work despite evidence[;]" "[a]busing your position of power every single day[;]" "[m]aking continu[ous] verbal-put downs[;]" "[m]aking undoable demands related to workloads, deadlines, [and] duties[;]" "[e]nsuring that my projects will fail by sabotaging my communication with others, changing the data, diminishing me in front of others, and saying awful things behind my back[;]" [c]hanging 15 hours of [the plaintiff's] sick leave into AWOL" after telling the plaintiff to go home; "[a]ccusing me of being a liar about being sick[;]" and "accusing" the plaintiff of "being unprofessional if I stand up to you." *Id.*, Ex. E at 1–2. Additionally, the following Monday morning, the plaintiff went to the OIG's office to speak to someone. *Id.* at 6.

Email correspondence submitted by the plaintiff in opposition to the pending motion indicates that, on November 24, 2014, the plaintiff "reported [her] concerns regarding [her] supervisor's behavior to the OIG who contacted" Barbara Viney, an EPA Conflict Management

9

Specialist and Violence Prevention Coordinator. *Id.*, Ex. T at 1–2. Beginning on December 1, 2014, the OIG and Viney "conducted a joint inquiry into the allegations and conducted a Threat Assessment with that information on [December 2, 2014]." *Id.*, Ex. T at 1–2. As part of the inquiry, Hilosky and Thomas were both interviewed, *id.*, Ex. T at 1, and the plaintiff's "allegations were not corroborated by [any] witnesses," *id.*, Ex. T at 1–2. On December 19, 2014, Viney met with the plaintiff "and notified [her] of th[e] outcome and the completion of [their] inquiry into the allegations." *Id.*, Ex. T at 1–2. Because both Hilosky and Thomas allegedly "work for" Breen, the defendant's supervisor, and other people interviewed allegedly "work for" the defendant, the plaintiff alleges that the investigation was "biased." *Id.*, Ex. T at 1.

### 3.    *June 3, 2015 Envelope-Throwing Incident*

The plaintiff alleges that, on June 3, 2015, at around 9:00 a.m., the defendant came to the "door" of her cubicle and "almost immediately . . . threw a manila envelope toward [the] [p]laintiff's face, and left." *Id.* at 6; *see also* Compl. The envelope, which contained a memorandum to the plaintiff with "an informal warning" from the defendant, fell on the floor and did not hit the plaintiff's face, but the plaintiff was "paralyzed with fear for a few minutes." Pl.'s Opp'n at 6; *see also id.*, Ex. F ("Mem. Warning") at 2; Compl.

The memorandum, which the plaintiff submitted as an exhibit to her opposition to the defendant's pending motion, is dated June 2, 2015, and was provided to the plaintiff "to warn you about your inappropriate language and tone in workplace correspondence." Mem. Warning at 1. It includes a list of examples of "personally insulting and unprofessional . . . . language" from a May 13, 2015 email sent by the plaintiff to the defendant and the defendant's supervisor about the plaintiff's mid-year performance review. *Id.*; *see also id.* at 3–4 (May 13, 2015 email correspondence). The memorandum further provides: "Your email was disparaging and had an

overall hostile tone.  I will not tolerate this misconduct and am warning you not to repeat it.  If you do so, you may be subject to disciplinary action." *Id.* at 1.

Approximately one hour after the envelope-throwing incident, at around 10:00 a.m., the plaintiff allegedly "received two threatening anonymous phone calls" from a man "repeating the word:  'Die . . . die . . . die.'"  Pl.'s Opp'n at 6; *see also* Compl.; Pl.'s Opp'n, Ex. Q (June 3, 2015 email correspondence with EPA OIG representative about "two anonymous calls to my office phone with a male voice wispering [sic] "die . . . die . . .").  The phone calls prompted the plaintiff, the same day, to (1) file the instant suit, Pl.'s Opp'n at 6; *see also* Compl., (2) call "Federal Protective Services," from which call an officer reported to the plaintiff's cubicle at around 3:30 p.m. that day, Pl.'s Opp'n at 7, and (3) report by email the incident to the defendant's supervisor, Barry Breen, *id.*

As a result of the plaintiff's email to Breen, the plaintiff received a call from a human resources employee who prepared a declaration for the plaintiff, which she signed, about the incident.  *Id.*; *see id.*, Ex. G, Decl. of Maricruz MaGowan (June 5, 2015) ("Pl.'s Decl.").  In the declaration, with respect to the envelope-throwing incident, the plaintiff attests, "my boss flung an envelope dismissively near my face and it slid off my desk and fell on the floor.  It did not touch me, but I feel the way she gave me this letter was a way of humiliating me.  She left immediately.  It was just seconds."  Pl.'s Decl.

### 4.    *Additional Allegations Of Wrongful Conduct*

In addition to the three incidents summarized above, the plaintiff describes a litany of complaints about her unpleasant interactions with her supervisor, including that, on "at least 20 occasions," the defendant "yelled" at her and, "while pointing [a] finger at [her]," "stood up too close to [her]," such that she "was getting [the defendant's] spit on [her] face," Compl.; "constant yelling, finger pointing toward Plaintiff's face, invading Plaintiff's physical space to the point

that Plaintiff got Brigid Lowery's spit on her face, violent gestures such as papers being thrown around, chairs pushed violently, and so on," Pl.'s Opp'n at 9; "mocking Plaintiff's accent;" "[t]hreatening Plaintiff constantly;" "[u]sing demeaning language such as 'You are doing much better, you are finally learning;'" "[h]arassing Plaintiff if she goes to the ladies room or pantry," by, for example, "calling Plaintiff [on] her cell phone, while she is in the ladies room," and before she leaves for the day by "coming to Plaintiff's cubicle just before it is her time to go home and commenting" about her presence and "by wanting Plaintiff to work on something new two minutes before Plaintiff's time to go home;" "always ask[ing] Plaintiff for 'proof' of what she is saying;" "making her work impossible" by "prohibit[ing] her from talking to [necessary workplace] contacts;" excluding the plaintiff from "the regular" division-wide staff meetings; "[h]umiliating Plaintiff in front of staff" by publicly "asking her . . . demeaning questions, such as 'Do you understand the process now?' 'Are you sure you really got what we are talking about?' 'Did you listen [to] what we are saying?';" "[t]alking to staff about personnel issues involving Plaintiff, and thus creating a hostile environment, by influencing some of Plaintiff['s] coworkers to dislike her;" "demanding [the plaintiff] . . . perform her job in an unreasonable time;" and "blaming [the plaintiff] for being late," *id.*, Ex. O at 1–3.

Similar accusations are reflected in six work emails sent by the plaintiff to the defendant between October 23, 2009 and September 3, 2014. *See id.*, Ex. O at 8 (October 23, 2009 email accusing the defendant of "escalat[ing] your retaliatory efforts" and causing the plaintiff "chest pains, and a strong headache"); *id.*, Ex. O at 11 (May 25, 2010 email accusing the defendant of yelling at and threatening the plaintiff); *id.*, Ex. O at 7 (November 16, 2011 email accusing the defendant of failing to "recognize my contributions" and "ma[king] it a practice to start most of our conversations with unwarranted accusations"); *id.*, Ex. O at 10 (March 28, 2010 email

accusing the defendant of "personal attacks" and "hostility" which "is affecting my health to the point that every morning that I don't telework, I get migranes [sic] and/or dizziness, and/and stomach aches"); *id.*, Ex. O at 4 (December 10, 2013 email accusing the defendant of "hostile behavior" that "continues in spite of the great efforts I make in working with you in the most professional manner"); *id.*, Ex. O at 6 (September 3, 2014 email accusing the defendant of "lack[ing] respect and empathy").

The plaintiff also alleges that the defendant has denied her the ability "to take professional training," though the defendant "encourages Plaintiff['s] coworkers to take training and actually authorizes these training efforts." Pl.'s Opp'n at 9. In this regard, the plaintiff says that her requests the last three years to take a "Conflict Resolution Skills" course "at the OPM Development Center" were accepted by the defendant, "but behind Plaintiff's back, Ms. Lowery did not sign the approval forms and Plaintiff has [been] deprived of taking any training in years." *Id.*; *see also id.*, Ex. N (email indicating that the defendant, as of April 22, 2015, had not approved a training request submitted by the plaintiff on March 30, 2015).

Lastly, the plaintiff notes that she has filed two cases with the United States Office of Special Counsel ("OSC"), Case Nos. MA-11-1151 and MA-15-1505, and four cases with the MSPB, Case Nos. MSPB-DC-1221-11-0737-B-1, MSPB-DC-1221-11-0737-B-2, MSPB-DC-11-0737-W-1, and DC-1221-15-0671-W-1, the latter of which is "still in process." Pl.'s Opp'n at 10. According to the plaintiff, the EPA has done "absolutely nothing to protect [the] [p]laintiff after any of the[] [incidents], since June 2010." *Id.* at 7 (emphasis omitted).

## B.    Procedural Background

On June 3, 2015, "after suffering the third physical assault in the last five years from Defendant Brigid Lowery and after countless acts of abuse, threats, and harassment," *id.* at 12,

13

the plaintiff filed a complaint, motion for a restraining order, and motion for a preliminary injunction in D.C. Superior Court, *see* Compl.; Pl.'s Sup. Ct. TRO Mot.; Pl.'s Sup. Ct. PI Mot., "to seek immediate protection" from allegedly "recurrent violent behavior . . . against her," Pl.'s Opp'n at 3, and "over [five] years of abuse," Pl.'s Sup. Ct. TRO Mot.; Pl.'s Sup. Ct. TRO Mot., by the defendant, her current government supervisor, Compl.  A hearing on the plaintiff's request for a temporary restraining order was scheduled to take place on June 16, 2015.  *See* Docket Sheet Summ. ("Sup. Ct. Dkt."), Entry No. 9, SCR at 2; Not. of Hr'g, SCR at 24.

The evening before the scheduled hearing, on June 15, 2015, the United States Attorney's Office for the District of Columbia removed the case to this Court, pursuant to 28 U.S.C. §§ 1442(a)(1), 1446, and the Westfall Act, 28 U.S.C. § 2679(d)(2), and the United States was substituted as the defendant.  *See* Sup. Ct. Dkt., Entry Nos. 6–7, SCR at 2; Notice of Filing of Removal of a Civil Action, SCR at 4; Not. of Removal; Certification.  A hearing was nonetheless held in D.C. Superior Court on June 16, 2016.  *See* Sup. Ct. Dkt., Entry No. 3, SCR at 1.  The record reflects that the plaintiff appeared for the hearing, but that the defendant did not because "this case had been transferred to Federal District Court."  *Id.*  After confirming that the case had been removed, the court denied the plaintiff's motion for a temporary restraining order for lack of jurisdiction.  *Id.*[2]

On June 19, 2015, the United States filed the pending motion to dismiss.  *See* Def.'s Mot., ECF No. 4.  The Court thereafter posted a Fox-Neal Order, ECF No. 7, *see Fox v. Strickland*, 837 F.2d 507, 509 (D.C. Cir. 1998) (holding that a *pro se* party must be advised of consequences of failing to respond to a dispositive motion, "includ[ing] an explanation that the failure to respond . . . may result in the district court granting the motion and dismissing the

---

[2]     Since the D.C. Superior Court disposed of the plaintiff's motion for a temporary restraining order, this motion was not pending upon removal.

case"); *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992) (holding that a *pro se* party must be advised, when motion to dismiss may be converted to a motion for summary judgment, that "any factual assertion in the movant's affidavits will be accepted by the district judge as being true unless [the opposing party] submits [her] own affidavits or other documentary evidence contracting the assertion" (quoting *Lewis v. Faulker*, 689 F.2d 100, 102 (7th Cir. 1982)) (internal quotation marks omitted)), directing the *pro se* plaintiff to file an opposition or otherwise respond to the defendant's motion by July 20, 2015.  Shortly before the due date for the plaintiff's opposition, on July 17, 2015, the plaintiff filed a document titled, "Plaintiff's Motion to Remand Case to the Superior Court for the District of Columbia Civil Division and/or Request Court to Order the U.S. Environmental Protection Agency to Provide Immediate Protection to Plaintiff from Defendant Brigid D. Lowery and Pay Plaintiff for Damages" ("Pl.'s Opp'n"), ECF No. 8.  The United States replied to the plaintiff's filing on July 23, 2015.  *See* Def.'s Reply Supp. Mot. Dismiss Pl.'s Compl. Against Brigid Lowery & U.S. & Opp'n Pl.'s Mot. TRO ("Def.'s Reply"), ECF No. 9.

Noting that the plaintiff's July 17, 2015 filing was not styled as an opposition, the Court requested clarification from the plaintiff as to "whether the plaintiff's filing, ECF No. 8, constitutes her response to the defendant's motion to dismiss . . . and . . . whether the plaintiff intends to file . . . any other opposition."  July 27, 2015 Order at 2.  The Court further instructed the plaintiff to file "any other opposition" by August 5, 2016, and permitted the defendant to file any additional reply by August 14, 2015.  *Id.*  The Court also denied (1) the plaintiff's request for "immediate protection from Brigid D. Lowery," *id.* (quoting Pl.'s Opp'n at 13), effectively denying, to the extent that the plaintiff had so moved, the plaintiff's motion for a temporary

restraining order or preliminary injunction, *see id.* at 2–3, and (2) the plaintiff's motion to remand the case to D.C. Superior Court, *see id.* at 3–4.

The parties then each submitted additional filings addressing the United States' motion to dismiss. *See* Pl.'s Suppl. Opp'n; Def.'s Suppl. Reply Supp. Mot. Dismiss Pl.'s Compl. Against Brigid Lowery & U.S. & Opp'n Pl.'s Mot. TRO ("Def.'s Suppl. Reply"), ECF No. 12; Pl.'s Reply.[3]  Sufficiently briefed, the United States' motion is ripe for review.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), federal courts must be mindful that they "are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (internal quotation marks omitted) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  A federal court lacking subject matter jurisdiction must dismiss the case.  FED. R. CIV. P. 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006); *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

---

[3]       In response to the plaintiff's last filing, the defendant filed a document styled, "Opposition to Plaintiff's Motion for Leave to File Surreply," ECF No. 14, arguing that the Court should disregard the plaintiff's last filing. Ordinarily, courts do not consider a plaintiff's third opposition brief. *See, e.g., Gibbs v. Jewell*, 36 F. Supp. 3d 162, 167 n.5 (D.D.C. 2014).  Since *pro se* plaintiffs, however, are afforded some leeway, the plaintiff's last filing is considered along with all of her other submissions. *See Brown*, 789 F.3d at 152.

"It is to be presumed that a cause lies outside [the federal court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377.  Thus, "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction . . . ." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Georgiades v. Martin-Trigona*, 729 F.2d 831, 833 n.4 (D.C. Cir. 1984) ("It is the burden of the party claiming subject matter jurisdiction to demonstrate that it exists.").

While the burden of establishing jurisdictional facts to support the exercise of the subject matter jurisdiction rests on the plaintiff, *see Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010); *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Moms Against Mercury*, 483 F.3d 824, 828 (D.C. Cir. 2007), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may "undertake an independent investigation to assure itself of its own subject matter jurisdiction," and consider facts developed in the record beyond the complaint.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107–08 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Where necessary to resolve a jurisdictional challenge under Rule 12(b)(1), 'the court may

consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" (quoting *Herbert*, 974 F.2d at 197)).

Where the federal government is a defendant, the plaintiff must establish federal subject matter jurisdiction as well as an applicable waiver of sovereign immunity to survive a motion to dismiss pursuant to Rule 12(b)(1). *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)); *see also Anderson v. Carter*, 802 F.3d 4, 8 (D.C. Cir. 2015) ("[A]n action against the United States cannot surpass the barrier of sovereign immunity without statutory waiver."); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").  In general, a waiver of sovereign immunity "must be unequivocally expressed in statutory text and will not be implied." *Sw. Power Admin. v. FERC*, 763 F.3d 27, 31 (D.C. Cir. 2014) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).  "Any ambiguities in the statutory language are to be construed in favor of immunity so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *FAA v. Cooper*, 132 S. Ct. 1441, 1448 (2012) (citations omitted).  Nonetheless, sovereign immunity and judicial review are closely linked, such that "the allowance of judicial review is a waiver of sovereign immunity and . . . the disallowance of such review is an assertion of sovereign immunity." *Bartlett v. Bowen*, 816 F.2d 695, 712 (D.C. Cir. 1987), *opinion reinstated on reconsideration sub nom.*, *Bartlett ex rel. Neuman v. Bowen*, 816 F.2d 1240 (D.C. Cir. 1987).

### B.      Rule 12(b)(5)

It is well settled that "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987).  "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  This is because service is necessary, but not sufficient, to allow a court to exercise personal jurisdiction over a defendant.  *See Mwani v. Bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005) (noting that "service of process does not alone establish personal jurisdiction").  Indeed, "[b]efore a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant . . . . There also must be authorization for service of summons on the defendant and a constitutionally sufficient relationship between the defendant and the forum." *Id.* (internal quotation marks and citations omitted; alteration in original).

When sufficiency of service is challenged, the burden is on the plaintiff to demonstrate that she has effected service properly.  *See Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (noting under Federal Rule of Civil Procedure 4 that "the plaintiff has the burden to demonstrate that the procedure employed to deliver the papers satisfies the requirements" of proper service) (internal quotation marks omitted); *see also* 4A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & ADAM N. STEINMAN, FEDERAL PRACTICE AND PROCEDURE § 1083 (4th ed. 2015) ("The party on whose behalf service of process is made has the burden of establishing its validity when challenged; to do so, she must demonstrate that the procedure employed to deliver the papers satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law.").  Insufficient service of process on a defendant "warrant[s] the court's dismissing [the

plaintiff's claims] without prejudice" under Federal Rule of Civil Procedure 12(b)(5).  *Simpkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997).

### C.   Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), to "encourage[] brevity," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007), and, at the same time, "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipses in original; citation omitted).  The Supreme Court has cautioned that although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Iqbal*, 556 U.S. at 678)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "grounds" for "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original), and "nudge[ ] [the] claims across the line from

conceivable to plausible," *id*. at 570; *see Banneker Ventures*, 798 F.3d at 1129 ("Plausibility

requires more than a sheer possibility that a defendant has acted unlawfully . . . ." (internal

quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Thus, "a complaint [does not]

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (second alteration in original).  In considering a

motion to dismiss for failure to plead a claim on which relief can be granted, the court must

consider the complaint in its entirety, accepting all factual allegations in the complaint as true,

"even if doubtful in fact," *Twombly*, 550 U.S. at 555; *see also Harris v. D.C. Water & Sewer*

*Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015), "but is not required to accept the plaintiff's legal

conclusions as correct," *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014); *see Harris*, 791 F.3d at 68

("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions." (quoting *Iqbal*, 556 U.S. at 678)), and "[t]hreadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice,"

*Harris*, 791 F.3d at 68 (alteration in original) (quoting *Iqbal*, 556 U.S. at 678); *Banneker*

*Ventures*, 798 F.3d at 1129 (same).  In addition, courts may "ordinarily examine" other sources

"when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated the

complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc.*,

551 U.S. 322.

Where, as here, the plaintiff is proceeding *pro se*, the court must "liberally construe[]" the

complaint, applying "less stringent standards than formal pleadings drafted by lawyers."

*Abdelfattah v. DHS*, 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting *Erickson v. Pardus*, 551 U.S.

89, 94 (2007) (per curiam)); *Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015) (same).  The

Court must consider "a *pro se* litigant's complaint 'in light of' all filings, including filings

responsive to a motion to dismiss," *Brown*, 789 F.3d at 152, and any "affidavits and exhibits . . . filed by a *pro se* litigant [that] were intended to clarify the allegations in the complaint," *Abdelfattah*, 787 F.3d at 529 (citing *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 677 (D.C. Cir. 2009)).  Thus, the *pro se* litigant may, "in effect, supplement his [or her] complaint with the allegations included in his [or her] opposition." *Brown*, 789 F.3d at 152.  Nonetheless, the *pro se* plaintiff must still "plead 'factual matter that permits [us] to infer more than the mere possibility of misconduct.'" *Id.* at 150 (alteration in original) (quoting *Atherton*, 567 F.3d at 681–82); *Abdelfattah*, 787 F.3d at 533 (quoting *Jones v. Horne*, 634 F.3d 588, 596 (D.C. Cir. 2011)).

## III.    DISCUSSION

As other decisions from this Court have recognized, "[t]he precise contours of [a *pro se*] plaintiff's claims are not [always] entirely clear from her complaint, motion for a TRO, or the opposition filed in response to [a] defendant's motion to dismiss," and, consequently, "the Court must construe a *pro se* plaintiff's [papers] broadly and look to the relief sought to infer the claims made wherever possible." *Davis v. United States*, 973 F. Supp. 2d 23, 26 (D.D.C. 2014) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).  In this case, the plaintiff's filings are liberally construed as bringing two types of legal claims:  (1) intentional torts—namely, assault and battery, *see* Sup. Ct. Civil Div. Civil Actions Branch Inf. Sheet, SCR at 32 (form completed by the plaintiff upon commencing the action which clearly denotes "Assault and Battery" as the "nature of suit"); and (2) discrimination claims—namely, (a) retaliation for reporting violence at work to the union by denial of promotion and sick leave, *see* Pl.'s Opp'n at 7–9; Fleming-Blue Decl. ¶ 7; (b) racial discrimination in failure to promote, *see* Pl.'s Opp'n at 12; and (c) racial and whistleblower harassment and hostile work environment, *see* Compl.; Pl.'s Opp'n at 5, 9; *id.*, Ex.

22

E at 1–2; *id.*, Ex. O at 1–3.  For the reasons discussed below, even when liberally construed, all of the plaintiff's claims must be dismissed.

### A.       The United States Is The Proper Defendant

As a threshold matter, the plaintiff contests the Westfall Act certification granting the defendant immunity and substituting the United States as the defendant.  She argues that the defendant "was acting <u>outside</u> the scope of her employment," Pl.'s Opp'n at 1 (emphasis in original), and that the plaintiff "does not have any reason to believe or has [sic] any proof that these attacks were ordered by the Agency's top Officials, or any other Agency/Office in the U.S. Government, or that this behavior is part of Ms. Lowery's official duties," *id.* at 3.  The plaintiff notes, however, that while she "believes that these actions were purely and solely committed by Brigid D. Lowery, and that Ms. Lowery was not acting within the scope of her employment as an employee of the U.S. Government," "if the Agency wants to be responsible for the monetary, professional, and psychological damages caused to Plaintiff for failing to provide her with any type of protection, Plaintiff will not argue and be willing to receiving [sic] also such compensation . . . in addition to prompt and effective protection from Ms. Lowery."  *Id.* (emphasis omitted).

"The Westfall Act grants a federal employee suit immunity . . . when 'acting within the scope of his [or her] office or employment at the time of the incident out of which the claim arose,'" including "an employee on duty at the time and place of an 'incident' alleged in a complaint who denies that the incident occurred."  *Osborn v. Haley*, 549 U.S. 225, 247 (2007) (quoting 28 U.S.C. § 2679(d)(1), (2)).  A Westfall Act certification, *see supra* n.1, "is *prima facie* evidence" that the defendant was acting within the scope of his or her employment, *Jacobs*

*v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013), but "[a] plaintiff may request judicial review of the Attorney General's scope-of-employment determination," *Osborn*, 549 U.S. at 246.

The plaintiff bears the burden of rebutting the certification. *Jacobs*, 724 F.3d at 220; *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003) ("A plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the certification."). "To rebut the certification, the plaintiff must allege, in either the complaint or a subsequent filing, specific facts 'that, taken as true, would establish that the defendant['s] actions exceed the scope of [his or her] employment.'" *Jacobs*, 724 F.3d at 220 (first alteration in original) (quoting *Stokes*, 327 F.3d at 1215); *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009).

When a plaintiff challenges the Westfall certification that the federal employee was acting within the scope of his or her employment, courts apply the *respondeat superior* law of the state where the alleged tort occurred. *See Jacobs*, 724 F.3d at 221–22; *Stokes*, 327 F.3d at 1214; *see also Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) ("The question of whether a particular act falls within the scope of employment is governed 'by the law of the place where the employment relationship exists.'" (quoting *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006))). Here, the governing law is that of the District of Columbia. Under District of Columbia law, an employee's scope of employment is determined by applying the test established in the Restatement (Second) of Agency. *See Allaithi*, 753 F.3d at 1330; *Jacobs*, 724 F.3d at 221–22. Under this test, the employee's conduct falls within the scope of his employment when: "(a) it is of the kind he [or she] is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another,

24

the use of force is not unexpectable by the master." *Allaithi*, 753 F.3d at 1330 (quoting

RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958)); *see also Jacobs*, 724 F.3d at 221.  The

District of Columbia interprets this test "very expansively," *Allaithi*, 753 F.3d at 1330 (quoting

*Harbury v. Haden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008)), such that the D.C. Circuit has

characterized the test as "akin to asking whether the defendant merely was on duty or on the job

when committing the alleged tort," *Harbury*, 522 F.3d at 422 n.4.

Here, accepting the plaintiff's allegations as true, the plaintiff has failed to rebut the

Westfall certification.  *See U-Haul Int'l, Inc. v. Estate of Albright*, 626 F.3d 498, 501 (9th Cir.

2010) (affirming the district court's upholding of the Westfall certification "while assuming all

of [plaintiff's] allegations to be true").

### 1.  *The Defendant's Alleged Conduct Was Incidental To Her Employment*

The plaintiff argues that the defendant's "actions against Plaintiff were . . . not part of her

regular duties" and "strongly refutes the Defendant's statement that Brigid Lowery's assaulting

Plaintiff in [sic] at least three occasions is part of her 'daily work' or 'regular activities.'"  Pl.'s

Opp'n at 10.  For support, the plaintiff points to the defendant's "Position Description" and "her

critical Job Elements (CJEs) contained in her [the defendant's] EPA Performance Appraisal and

Recognition System (PARS)," which the plaintiff argues do not "include constantly harassing,

abusing, attacking, instilling fear or assaulting Plaintiff."  *Id.*; *see also id.*, Ex. P (official EPA

document containing "critical elements, performance standards, and performance measures

directly related to [Brigid Lowery's] job"); Pl.'s Suppl. Opp'n at 2 ("[N]one of the[] [defendant's

work duties] include[] the abuse of her authority against another Federal employee . . . .").  The

plaintiff's argument is inconsistent with District of Columbia law.

The first prong of the District of Columbia scope-of-employment test "has two disjunctive parts:  To qualify as conduct of the kind [an employee] was employed to perform, the defendant's actions must have either been of the same general nature as that authorized or *incidental* to the conduct authorized."  *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (internal quotation marks omitted; emphasis in original) (quoting *Haddon v. United States*, 68 F.3d at 1424 (D.C. Cir. 1995)).  "Conduct is 'incidental' so long as it is 'foreseeable,'" and it is "foreseeable" if it is a "direct outgrowth of the employee's instructions or job assignment."  *Allaithi*, 753 F.3d at 1332 (quoting *Haddon*, 68 F.3d at 1424).  The court must "focus on the type of act [the employee] took that allegedly gave rise to the [claim], not the wrongful character of that act," *Jacobs*, 724 F.3d at 221, and "[t]he test is not . . . particularly rigorous," *Allaithi*, 753 F.3d at 1332.  Indeed, "[t]he foreseeability test," which "is to be liberally applied," is "broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf."  *Id.* (quoting *Ballenger*, 444 F.3d at 664).  Thus, even wrongful conduct, foreseeably performed in conjunction with specified job duties, is "incidental" to the conduct the employee is hired to perform under District of Columbia law.

Here, all of the alleged incidents and wrongful conduct occurred during interactions involving the parties' work at the EPA and, thus, in the course of the defendant's performance of her supervisory duties.  First, the June or July 2010 telephone-throwing incident occurred during a morning work meeting in the defendant's office, *see* Pl.'s Opp'n at 5; *see also* Fleming-Blue Decl. ¶ 3 (attesting that the plaintiff "reported . . . that she was meeting with her manager . . . on Friday, June 18th 2010 at Ms. Lowery's office," that "[t]hey disagreed on a work related issue which they interpreted differently," and that, ultimately, the defendant "stated: 'O.K. let's call

Rick' at which time she threw the telephone toward" the plaintiff), and the defendant is certainly authorized to hold work meetings with employees, *see id.*, Ex. P at 6, 8 (stating that the defendant's position requires her to "manage[] subordinates based on organizational goals" and "[m]anage on-time performance of OSWER's measures reporting activities"). The defendant's alleged retaliatory actions related to that incident—including speaking ill of the plaintiff to prospective employers and denying the plaintiff sick leave—also occurred in the context of the defendant's employment duties. *See Jacobs*, 724 F.3d at 291 (holding that "responding to a prospective employer's request for a reference[] is plainly 'the kind of conduct [plaintiff's supervisor] was employed to perform.'" (quoting *Ballenger*, 444 F.3d at 664)); Pl.'s Opp'n, Ex. P at 6 (stating that the defendant's position requires her to "[e]ffectively manage the staff and resources" including "staff workload and staffing needs").[4]

Similarly, allegations relating to the November 21, 2014 physical fight-attempt incident, as shown in an email sent by the plaintiff to the defendant's supervisor the afternoon after the incident, *see* Pl.'s Opp'n, Ex. E at 1–2, indicate that any altercation between the parties was entirely work-related. For example, the plaintiff complains that the defendant gave her an increasingly heavy workload, accused her of making "errors" in work product, and made "undoable demands related to workloads, deadlines, [and] duties." *Id.*, Ex. E at 1–2; *see also id.*

---

[4]     The plaintiff's claim that the defendant rewrote the plaintiff's job classification to eliminate the plaintiff's GS-15 level promotion potential is not plausible based on her own allegations and evidence. The "Notification of Personnel Action" submitted by the plaintiff as an "example[]" of the "routine abuse/threats/harassment events" she suffered from the defendant, Pl.'s Opp'n at 9, indicates that, effective May 13, 2007, and officially approved by a "Human Resources Specialist," the plaintiff was reassigned from a "Lead Program Analyst" position at OUST to a "Program Analyst" position at "Office of Brownfields Cleanup & Redevelopment," *id.*, Ex. O at 16. Notably, the document "[r]emarks" that the plaintiff's reassignment position "is at the full performance level." *Id.* According to the plaintiff, the defendant did not even become her supervisor until December 2008, over a year after the position reassignment was made. *See* Pl.'s Opp'n at 5. Thus, because the factual content pled by the plaintiff is *inconsistent* with the defendant's liability and does not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, the defendant's motion is granted with respect to any claim predicated on this allegation, pursuant to Federal Rule of Civil Procedure 12(b)(6).

at 6 (alleging that the November 21, 2014 incident occurred after the defendant requested the
plaintiff go into the defendant's office to "yell[] at Plaintiff as she did other times").

Lastly, the alleged June 3, 2015 envelope-throwing conduct was incidental to the
defendant's supervisory duties, which include "tak[ing] action to address [employee]
performance problems," *id.*, Ex. P at 6, such as delivering an informal, written warning
memorandum to an employee to address the employee's misconduct.  Thus, the Court finds that
the conduct alleged occurred, at the very least, incidentally to the kind of conduct the defendant
was employed to perform as a supervisory employee.  The wrongful nature of the conduct
alleged here is irrelevant to the determination that the act was "incidental" to the conduct the
defendant was hired to perform.  *See Jacobs*, 724 F.3d at 222–23; *see also Allaithi*, 753 F.3d at
1333 (indicating that, where the conduct is not "devoid of a connection between tort and
employer," it is essentially foreseeable).

### 2.  *The Defendant's Alleged Conduct Occurred Substantially Within Authorized Time And Space Limits Of Employment*

The defendant's alleged wrongdoing in this case "occur[red] substantially within the
authorized time and space limits" of the defendant's employment because it occurred entirely in
the workplace during the work day.[5]

---

[5]     The only conduct that the plaintiff alleges occurred outside of the workplace or work day is (1) the
defendant's allegedly causing the cracking of plaintiff's car windshield in 2010, *see* Pl.'s Opp'n at 12–13, and (2)
the defendant's allegedly causing the plaintiff to receive "crank calls in the middle of the night," *id.* at 13.  With
respect to these claims, the plaintiff pleads no facts from which any reasonable inference can be drawn that the
defendant is liable.  *See Iqbal*, 556 U.S. at 678.  The same is true for the plaintiff's allegations concerning the "two
threatening anonymous phone calls" from a man that she received at work on June 3, 2015, when the defendant is a
woman.  Pl.'s Opp'n at 6.  Thus, the defendant's motion is granted with respect to any claim predicated on these
factual allegations, pursuant to Rule 12(b)(6).

### 3.    *The Defendant Allegedly Acted At Least Partially Out Of A Desire To Serve Her Employer*

To meet the third prong of the test, it is necessary to show the employee's act was "solely for the servant's personal benefit" and "not done for the employer at all." *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006); *see also Allaithi*, 753 F.3d at 1333 ("Local [D.C.] law requires an employee be *solely* motivated by his [or her] own purposes for consequent conduct to fall outside the scope of employment."). The relevant inquiry is whether the defendant was motivated at least in part by a desire to serve her employer. *Jacobs*, 724 F.3d at 222–23; *Schecter*, 892 A.2d at 428. Thus, even if the plaintiff alleges the defendant had an ulterior motive to abuse and harass the plaintiff, the plaintiff must offer allegations that the defendant did so without any desire to serve her employer simultaneously.

The plaintiff has made no such proffer. The plaintiff makes no allegations of any dispute or conflict between the parties prior to the defendant assuming a supervisory role over the plaintiff at the workplace, or any other allegations that, outside of the employment context, the defendant had any motive to abuse and assault the plaintiff. *See Steele v. Meyer*, 964 F. Supp. 2d 9, 19 (D.D.C. 2013). Indeed, the plaintiff's assertions that the defendant "[f]alsely accused" her of making "errors" and made "undoable demands related to workloads, deadlines, [and] duties," among many other work-related allegations, Pl.'s Opp'n, Ex. E at 1–2; *see also id.*, Ex. O at 1–3, indicate the exact opposite—that the defendant's conduct was motivated by her job. Thus, the plaintiff has failed to sufficiently challenge this prong of the scope-of-employment test.

### 4.    *The Defendant's Alleged Use Of Force Was Not "Unexpectable"*

The only alleged use of force by the defendant is that of the June or July 2010 telephone throwing. Given that this alleged used of force occurred during a morning work meeting and arose from a "disagree[ment] on a work related issue which they interpreted differently,"

Fleming-Blue Decl. ¶ 3, it cannot be said to have been "unexpectable." Indeed, the D.C. Circuit has recognized that "cases hold[] that seriously criminal and violent conduct can still fall within the scope of a defendant's employment under D.C. law—including sexual harassment, a shooting, armed assault, and rape." *Harbury v. Hayden*, 522 F.3d 413, 422 (D.C. Cir. 2008) (collecting cases).

In sum, the plaintiff has failed to put forth sufficient facts to allege that the defendant was acting outside the scope of her employment, and the United States is thus the proper defendant in this action.[6]

### B.     The Plaintiff's Intentional Tort Claims Are Not Cognizable Under The FTCA And Must Therefore Be Dismissed

The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn*, 549 U.S. at 229 (citing 28 U.S.C. § 2679(b)(1)). Thus, upon the United States' substitution "as defendant in place of the employee," "[t]he litigation is . . . governed by the Federal Tort Claims Act . . . ." *Id.* at 230. The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, provides a limited waiver of sovereign immunity where a plaintiff seeks monetary damages for certain common law torts committed by federal employees. *See* 28 U.S.C. §§ 1346(b), 2671–80; *Wilson*

---

[6]      The plaintiff argues that the defendant is not entitled to immunity under the Westfall Act pursuant to 28 U.S.C. § 2679(b)(2)(B), which provides that the immunity granted by § 2679(b)(1) "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized," 28 U.S.C. § 2679(b)(2)(B), because "Defendant Brigid D. Lowery violated at least one statute of the United States, such as: Title 8, Chapter 39.01(a)(1); Title 18, U.S.C., Section 242, the Civil Rights Act of 1964; and, 5 U.S.C. § 2302(b)," Pl.'s Opp'n at 1. The plaintiff's citations make little sense. Title 8 of the United States Code does not contain a "Chapter 39.02(a)(1)," and 18 U.S.C. § 242 is a criminal statute that punishes deprivations of federal rights under color of law but provides no private right of action, *see Rockefeller v. U.S. Court of Appeals Office, for Tenth Circuit Judges*, 248 F. Supp. 2d 17, 23 (D.D.C. 2003) ("[T]he plaintiff is precluded from asserting any claims pursuant to 18 U.S.C. §[] 242 . . . because, as [a] criminal statute[], [it does] not convey a private right of action." (citations omitted; alteration in original)). Thus, neither of those statutes authorize an action against the defendant in this case. The plaintiff's claims which implicate the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 2302(b), are addressed *infra* in Part III.C.

*v. Obama*, 770 F. Supp. 2d 188, 191 (D.D.C. 2011) (citing *Roum v. Bush*, 461 F. Supp. 2d 40, 46

(D.D.C. 2006)).  Assault and battery claims, however, are not permitted.  *See* 28 U.S.C. §

2680(h) (providing that the FTCA "shall not apply to . . . [a]ny claim arising out of assault, [or]

battery"); *see also Banks v. Harrison*, 864 F. Supp. 2d 142, 147–48 (D.D.C. 2012) (dismissing

assault claims as not cognizable under FTCA); *Tolson v. Stanton*, 844 F. Supp. 2d 53, 57 (D.D.C.

2012) (recognizing that the FTCA "expressly excludes claims 'arising out of assault [and]

battery'" (alteration in original) (quoting 28 U.S.C. § 2680(h)); *Koch v. United States*, 209 F.

Supp. 2d 89, 94 (dismissing plaintiff's assault claim as not cognizable under the FTCA), *aff'd*,

No. 02–5222, 2002 WL 31926832, at *1 (D.C. Cir. Dec. 31, 2002) (per curiam) ("Because

appellant's claims, which arise out of an alleged assault, are not cognizable under the FTCA, *see*

28 U.S.C. § 2680(h), the district court properly dismissed appellant's complaint.").[7]  Therefore,

these claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of

subject matter jurisdiction.[8]

---

[7]     The FTCA contains an "arising out of assault" exception that applies only "with regard to acts or omissions of investigative or law enforcement officers of the United States Government."  28 U.S.C. § 2680(h).  Since nothing in the record indicates that the defendant is an "investigative or law enforcement officer," the exception does not apply in this case.

[8]     The United States also argues, that the plaintiff failed to exhaust administrative remedies for her FTCA claims, as required under 28 U.S.C. § 2675(a).  *See* Def.'s Mem. at 8–9; Def.'s Reply at 6–7; Def.'s Suppl. Reply at 4–5; *Ali v. Rumsfeld*, 649 F.3d 762, 775 (D.C. Cir. 2011) ("view[ing] the failure to exhaust administrative remedies [under the FTCA] as jurisdictional" (quoting *Rasul v. Myers*, 512 F.3d 644, 661 (D.C. Cir. 2008), *vacated on other grounds*, 555 U.S. 1083 (2008), *reinstated*, 563 F.3d 527 (D.C. Cir. 2009) (per curiam)); *Emrit v. NIH*, No. 14-2083(BAH), 2016 WL 370705, at *2 (D.D.C. Jan. 29, 2016) ("[E]xhaustion is a requirement of the FTCA, . . . that the Court of Appeals has deemed to be jurisdictional." (internal quotation marks and citation omitted) (collecting cases)).  In addition, with respect to the $300,000 money judgment sought by the plaintiff, the United States notes that the plaintiff may not bring a suit for money damages for injuries she sustained during the course of her employment because she is a federal employee and, thus, statutorily precluded from bringing such a suit under the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101, *et seq. See* Def.'s Mem. at 10; *Davis v. United States*, 973 F. Supp. 2d 23, 28 (D.D.C. 2014) (citing 5 U.S.C. § 8116(c) and *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 19–20 (D.D.C. 2013)); *Aviles-Wynkoop*, 978 F. Supp. 2d at 19–20 ("[FECA] precludes civil actions by federal employees seeking tort recovery for injuries sustained during the course of their employment[,] . . . . [and] 'was designed to protect the Government from suits under statutes, such as the [FTCA], that had been enacted to waive the Government's sovereign immunity.'" (quoting *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 194 (1983))); *see also Tolson*, 844 F. Supp. 2d at 57 ("The FECA offers the exclusive remedy for a claimant to whom the United States is liable for a federal employee's workplace injury." (citation omitted)).  Finally, the United States argues that the plaintiff's request for injunctive relief prohibiting the defendant from having "any kind of

### C.     The Plaintiff's Discrimination Claims Must Be Dismissed For Failure to State a Claim for Relief

The United States argues that the plaintiff's discrimination claims should be dismissed, first, for lack of jurisdiction on procedural grounds because the plaintiff failed to effect proper service and "to bring her discrimination claims against the proper defendant," Def.'s Mem. at 10–12; and, second, in passing, because the plaintiff's complaint fails to meet the required pleading standard under Federal Rule of Civil Procedure 8(a), *id.* at 3; *see also* Def.'s Mot. at 1– 2.  Each of these arguments is addressed *seriatim* below.[9]

---

contact with" the plaintiff, Pl.'s Sup. Ct. PI Mot. (emphasis in original); Pl.'s Sup. Ct. TRO Mot. (emphasis in original); *see also* Pl.'s Opp'n at 12 ("reiterate[ing] the need to prohibit Defendant, Brigid D. Lowery to have any kind of contact with the Plaintiff"), is not cognizable because "[c]ourts are not in the business of enjoining future actions of specific government officials, even in their individual capacities," *Davis*, 973 F. Supp. 2d at 27 n.2 (collecting cases); Def.'s Mem. at 7. Despite the obvious merits of these arguments, this case is resolved on alternative grounds.

[9]      The United States also seeks dismissal of the plaintiff's discrimination and retaliation claims because she failed to exhaust administrative remedies. Def.'s Mem. at 10–11; Def.'s Reply at 6–7 & n.4; Def.'s Suppl. Reply at 6 n.1. Indeed, a plaintiff must exhaust administrative remedies before bringing a claim under Title VII, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05, 109 (2002); *Hernandez v. Pritzker*, 741 F.3d 129, 134 (D.C. Cir. 2013); *Norris v. Salazar*, 885 F. Supp. 2d 402, 414 n.13, 417 (D.D.C. 2012), or the claim must be dismissed under Federal Rule of Civil Procedure 12(b)(6), *see Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) ("Title VII's exhaustion requirements are not jurisdictional."); *Norris*, 885 F. Supp. 2d at 414 n.13 ("Courts must dismiss Title VII actions for not timely exhausting administrative remedies under Federal rule of Civil Procedure 12(b)(6). . . ." (collecting cases)).  Similarly, "[u]nder the [Civil Service Reform Act] CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit," *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433 (D.C. Cir. 1996), and in some situations, no relief or judicial review is available at all, *see Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013); *Filebard v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) ("Congress, through the [CSRA] . . . , and related employment statutes has carefully constructed a system for review and resolution of federal employment disputes, intentionally providing—and intentionally not providing— particular forums and procedures for particular kinds of claims."); *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004); *Nat'l Treasury Emps. Union v. Egger*, 783 F.2d 1114, 1114 (D.C. Cir. 1986) (affirming dismissal for lack of subject matter jurisdiction because the CSRA precludes judicial review of minor personnel actions). The United States, rather than the plaintiff, bears the burden of showing administrative exhaustion with respect to Title VII claims.  *See Johnson v. Billington*, 404 F. Supp. 2d 157, 162 (D.D.C. 2005) ("Failure to exhaust administrative remedies is considered an affirmative defense[,] . . . . [and] [a]s such, 'the defendant bears the burden of pleading and proving it.'" (quoting *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997))).

The plaintiff represents that "for (5) years, Plaintiff contacted all resources available to her within the Executive Branch regarding those issues to no avail," Pl.'s Opp'n at 1, including the EPA OIG, the OSC, the EPA Office of Civil Rights, the EPA Office of Human Resources, and the MSPB, where the plaintiff represents "there are three cases related to Brigid Lowery's behavior, the third one still in process," Pl.'s Opp'n at 11; *see also* Pl.'s Suppl. Opp'n at 2 (listing agency offices from which the plaintiff "sought protection"); Pl.'s Reply at 1 (asserting that the plaintiff "exhausted all her administrative remedies by going first to the Office of the Inspector General (OIG) at EPA, then to the Office of the Special Counsel (OSC), and then to the MSPB"), but notably fails to reference any contact with an Equal Employment Opportunity ("EEO") counselor or the filing of any formal administrative complaint regarding discrimination with the Equal Employment Opportunity Commission. *See* 29 C.F.R. §§ 1614.105–06. Nevertheless, mixed Title VII and CSRA discrimination-based claims may be brought

1.      *Lack of Jurisdiction on Procedural Grounds*

The United States seeks dismissal of the plaintiff's suit on two procedural grounds, both of which may be remedied.  First, the United States points out that the plaintiff did not properly serve the United States as required by Federal Rule of Civil Procedure 4(i)(3) and, thus, her complaint is subject to dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(5).  Def.'s Mem. at 11–12.  Since this action was commenced in D.C. Superior Court, the sufficiency of process is determined by District of Columbia law.  *See* WRIGHT, MILLER & STEINMAN, *supra*, § 1082 ("In determining the validity of service in the state court prior to removal, a federal court must apply the law of the state under which the service was made.").  Under District of Columbia law, "[s]ervice on an officer or employee of the United States sued in an individual capacity for acts or omissions occurring in connection with the performance of duties on behalf of the United States . . . is effected by *serving the United States* in the manner prescribed by Rule 4(i)(1) *and* by serving the officer or employee in the manner prescribed by Rule 4(e), (f), or (g)."  D.C. Super. Ct. R. Civ. P. 4(i)(2)(B) (emphasis added).  Thus, the plaintiff was required to serve both the defendant and the United States, but she served only the defendant.  *See* SCR at 22–23.

Upon removal of the case, the plaintiff had an opportunity to cure the insufficiency of her service of process by properly effecting service under the Federal Rules of Civil Procedure.  *See* 28 U.S.C. § 1448; WRIGHT, MILLER & STEINMAN, *supra*, § 1082 ("[A] defect in service that

---

before the MSPB.  *See Jones v. DOJ*, 111 F. Supp. 3d 25, 30–31 (D.D.C. 2015) (noting that a federal employee may bring related Title VII claims in connection with certain claims brought under the CSRA on appeal to the MSPB); *Gibbs v. Jewell*, 36 F. Supp. 3d 162, 167 (D.D.C. 2014) ("Federal employees may . . . bring [Title VII] claims to district court after exhausting the requisite EEO procedures, but they also may elect to pursue their discrimination-based claims before the MSPB." (citing 5 U.S.C. § 7702)); *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 260 (D.D.C. 2013) ("A federal employee may accomplish administrative exhaustion of his Title VII claim by *either* filing a complaint with the agency's Equal Employment Opportunity office *or* by administratively filing a 'mixed case appeal,' which includes both discrimination and non-discrimination claims, directly with the MSPB." (emphasis added) (quoting *Butler v. West*, 164 F. 3d 634, 638 & n.6 (D.C. Cir. 1999))).  The United States does not address whether the plaintiff's complaints pending before the MSPB are such mixed claims but, in any event, since the pending motion to dismiss is resolved on alternative grounds, the Court need not determine whether the United States has met its burden of showing the plaintiff's failure to exhaust administrative remedies.

occurs prior to removal can be cured after removal by the federal court issuing new process or by an amendment of the original process. . . . The sufficiency of service made after removal . . . is to be judged under federal rather than state law.").  The plaintiff has taken no action to cure the insufficiency of process, even though she was put on notice of the insufficiency by the instant motion to dismiss, filed four days after removal.  *See* Not. of Removal (filed on June 15, 2015); Def.'s Mot. (filed on June 19, 2015); Def.'s Mem. at 11 (arguing that the plaintiff failed to effect proper service).  Moreover, the plaintiff's belief that her lawsuit is against the defendant in an individual capacity acting outside the scope of federal employment is not an excuse.  The law is clear that "where the lawsuit could be regarded as involving . . . [a federal official's] official duties—as when there is an employment relationship between plaintiff and defendant," regardless of whether the defendant "is being sued[] ostensibly in her individual capacity," the plaintiff is "obligated to serve the United States" under Federal Rule of Civil Procedure 4(i)(3).  *Light v. Wolf*, 816 F.2d 746, 747, 751 & n.14 (D.C. Cir. 1987).[10]  As a result of the plaintiff's insufficient service, the Court lacks personal jurisdiction over the defendant.  *Mann*, 681 F.3d at 372.

Nevertheless, a party must be allowed "a reasonable time to cure its failure to . . . serve the United States under Rule 4(i)(3), if the party has served the United States officer or employee."  FED. R. CIV. P. 4(i)(4)(B).  Moreover, "[p]ro se plaintiffs are allowed more latitude than litigants represented by counsel to correct defects in service of process," so district courts should, after "supply[ing] . . . notice of the consequences of not complying with procedural rules," "permit[] *pro se* litigants to perfect service of process."  *Moore v. Agency for Int'l Dev.*,

---

[10]     *Light* was decided under the 1987 version of Rule 4(d)(5), which then "govern[ed] the service of process upon federal officials."  816 F.2d at 748.  In 1993, Rule 4 was amended and the provision governing such service was moved to subdivision (i), where it remains today.  *See* FED. R. CIV. P. 4 advisory committee's note to 1993 amendment.

994 F.2d 874, 876 (D.C. Cir. 1993). Therefore, the plaintiff's claims will not be dismissed for defective service.[11]

Likewise, "[t]o the extent . . . Plaintiff's . . . claims imply discrimination, harassment, or being subjected to a hostile work environment," the United States argues that the claims must be dismissed because the plaintiff "failed to bring her discrimination claims against the proper defendant." Def.'s Mem. at 10. Federal employees may sue for employment discrimination under Title VII the "head of the department, agency, or unit, as appropriate" for employment discrimination, retaliation or hostile work environment. 42 U.S.C. § 2000e-16(c); *see Hackley v. Roudebush*, 520 F.2d 108, 115 n.17 (D.C. Cir.1975) ("The only proper defendant in a Title VII suit . . . is the 'head of the department, agency, or unit' in which the allegedly discriminatory acts transpired."). The plaintiff has brought her claims against her supervisor rather than the head of the EPA. Thus, the plaintiff's employment discrimination claims are subject to dismissal for lack of subject matter jurisdiction. *See Davis*, 973 F. Supp. 2d at 29; *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 20 (D.D.C. 2013); *Norris v. Salazar*, 885 F. Supp. 2d 402, 412 (D.D.C. 2012) ("[T]he Court lacks jurisdiction over the plaintiff's claims because the plaintiff failed to name the proper defendant, and, therefore, her Amended Complaint must be dismissed pursuant to Rule 12(b)(1).").

---

[11]     The plaintiff alleges that she was not properly served with a copy of the notice of removal filed by the United States on June 15, 2015, and seeks damages and sanctions against the defendant on these grounds. Pl.'s Opp'n at 2–3, 13. While the precise legal theory underlying the plaintiff's claim is unclear, the Court finds that the plaintiff has failed to state a claim upon which relief can be granted. Indeed, contrary to the plaintiff's assertions, the defendant's service of the notice of removal at issue complied with all applicable service rules. *See* Not. of Removal at 4 (certificate of service). The defendant served the plaintiff with a copy of a "written notice" by "mailing it to [her] last known address," FED. R. CIV. P. 5(a)(1)(E), (b)(2)(C), and filed proof of service in the form of a "certificate of an attorney of record," LCvR 5.3; *see* FED. R. CIV. P. 5(d). In other words, the defendant did in fact serve the plaintiff "according to Court Rules." Pl.'s Opp'n at 2. Accordingly, this claim is without legal foundation and is dismissed.

As other decisions from this Court have recognized, however, the plaintiff "could rectify this procedural defect by filing an amended complaint identifying the proper defendant." *Davis*, 973 F. Supp. 2d at 29; *see also Aviles-Wynkoop*, 978 F. Supp. 2d at 20 ("Of course, the plaintiff may cure this technical jurisdictional defect by amending her complaint to name the proper defendant."). Therefore, the plaintiff's claims will not be dismissed for this procedural defect either.

### 2.      *Failure to State Claims*

The plaintiff's discrimination claims must be dismissed under Federal Rule of Civil Procedure 12(b)(6) because the plaintiff fails to state claims for relief. *See Dominguez v. District of Columbia*, 536 F. Supp. 2d 18, 22 (D.D.C. 2008) (noting that, where dismissing claims without prejudice on procedural grounds "would lead to the filing of a meritless claim, . . . our Circuit has held that it is proper to consider other means of dismissing the case" (citing *Simpkins*, 108 F.3d at 369–70 (D.C. Cir. 1997)); *see also Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 726 (D.C. Cir. 1990) (holding a district court may *sua sponte* dismiss a complaint for failure to state a claim upon which relief can be granted). As noted, the plaintiff specifically alleges claims of (1) retaliation for reporting violence at work to the union by denial of promotion and sick leave, *see* Pl.'s Opp'n at 7–9; Fleming-Blue Decl. ¶ 7; (2) racial discrimination in failure to promote, *see* Pl.'s Opp'n at 12; and (c) racial and whistleblower harassment and hostile work environment, *see id.* at 5, 9; *id.*, Ex. E at 1–2; *id.*, Ex. O at 1–3; Compl. For the following reasons, the plaintiff has failed to allege sufficient facts to show plausibly that she is entitled to relief for any of these claims, which must therefore be dismissed.

a.    *The Plaintiff Fails To State A Claim For Retaliation Based On Her Reporting Violence At Work To The Union*

Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). To establish a *prima facie* case of retaliation, "the plaintiff must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012)); *see Doak v. Johnson*, 798 F.3d 1096, 1107 (D.C. Cir. 2015) ("To establish a *prima facie* case of retaliation based on circumstantial evidence, a plaintiff must show that (i) she engaged in statutorily protected activity; (ii) she suffered a materially adverse action by her employer; and (iii) a causal link connects the two." (internal quotation marks omitted) (quoting *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014))). Generally, "[a]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a *prima facie* case." *Brady*, 520 F.3d at 493. Where, as here, however, the employer has not asserted any legitimate, non-discriminatory reason for the alleged adverse employment action, the plaintiff must still allege a *prima facie* case. *Id.* at 494 & n.2.

The plaintiff fails sufficiently to allege even the first prong for a retaliation claim. Title VII "forbids retaliation against an employee because she has 'opposed any practice made an unlawful employment practice by' Title VII, or because she 'made a charge' under Title VII." *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (quoting § 2000e-3(a)). Thus, under the first prong, the plaintiff must demonstrate "that she made a charge or opposed a practice made

unlawful by Title VII . . . ." *Id.* at 39; *see also Welzel v. Bernstein*, 436 F. Supp. 2d 110, 118
(D.D.C. 2006) ("[T]o satisfy the first prong of a prima facie case for retaliation under Title VII,
plaintiff must demonstrate that she engaged protected activity—whether it be opposition or
participation—within the meaning of § 2000e-3(a).").  Where the complaint fails to allege "that
an employee engaged in statutorily protected activity," the complaint fails to state a claim.
*Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Library of Cong., Inc. v.
Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013); *see also Gilbert v. Napolitano*, 670 F.3d 258, 262
(D.C. Cir. 2012) (affirming dismissal of retaliation claim where plaintiff claimed retaliation for
making request for "fair treatment going forward," which did not qualify "as opposing a practice
made unlawful by Title VII"); *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (noting
that where a plaintiff "fails to offer evidence from which a jury could conclude that he opposed a
practice that could 'reasonably be thought' to violate Title VII, he fails to satisfy the first element
of his cause of action").  As the D.C. Circuit observed, "Not every complaint garners its author
protection under Title VII."  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)
(citing *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1010 (8th Cir. 2005) (stating that commenting
about absence of black employees, without alleging discrimination, was insufficient to qualify as
protected activity), and *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727–28 (7th Cir. 2003)
(stating that complaining about being 'picked on,' without mentioning discrimination or
otherwise indicating that gender was an issue, does not constitute protected activity, even if the
employee honestly believes she is the subject of sex discrimination)).

The plaintiff alleges that she reported to the union the alleged violence she suffered at the
hands of her supervisor, but she makes no allegation whatsoever that she reported any alleged
discriminatory conduct or ill-treatment based on her race, color, religion, sex, or national origin,

which would be unlawful *under Title VII*, nor does she allege that she believed she was reporting discriminatory conduct to the union. *See* Fleming-Blue Decl. ¶ 3 (attesting that the plaintiff reported that the alleged violence arose from a "disagree[ment] on a work related issue which they interpreted differently"). Therefore, the plaintiff's reporting to the union about violence she allegedly suffered at work was not an activity protected *by Title VII*. By extension, any alleged denial of a promotion or denial of sick leave to the plaintiff for her reporting to the union could not have been retaliation under Title VII.

> **b.    *The Plaintiff Fails To State A Claim For Racial Discrimination In Failure To Promote***

The plaintiff baldly asserts that the EPA has prevented her from being promoted to hold a GS-15 grade-level position because she is not white. *See* Pl.'s Opp'n at 12. To establish a *prima facie* case for failure to promote, the plaintiff must allege "that (1) [s]he is a member of a protected class; (2) [s]he applied for and was qualified for an available position; (3) despite [her] qualifications [s]he was rejected; and (4) either someone not of [her] protected class filled the position or the position remained vacant and the employer continued to seek applicants." *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000). "[T]he burden of establishing a prima facie case 'is not onerous,'" *id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), and, indeed, "[t]o prevail on a motion to dismiss, it is not [even] necessary to establish a *prima facie* case," *Greer v. Bd. of Trs. of the Univ. of the D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015) (citing *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 162 (D.C. Cir. 2015)). Still, the plaintiff's allegations must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570), and the plaintiff "must allege 'facts that, if true, would establish the elements of each claim,'" *Greer*, 113 F. Supp. 3d at 310 (quoting *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C.

2011).  In other words, the plaintiff must "state[] simply, concisely, and directly events that"
entitle her to relief.  *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014).

     The plaintiff has not done so.  The plaintiff merely asserts that she applied repeatedly for
GS-15 level positions without success and alleges that OSWER promoted only white employees
to GS-15 level from 2010 through 2013.  *See* Pl.'s Opp'n at 7, 12; *id.*, Ex. H at 1–4; *id.*, Ex. U at
10.  She has not alleged what positions she applied for, or even whether those positions were
affiliated with OWSER.  Thus, the plaintiff has not "plead facts sufficient to show that her claim
has substantive plausibility," *Johnson*, 135 S. Ct. at 347, and her failure-to-promote claim must
be dismissed.

     **c.**     ***The Plaintiff Fails To State A Hostile Work Environment Claim***

     The plaintiff's laundry list of allegations of harassment and wrongful conduct are also not
actionable as a hostile work environment claim.  Harassment is actionable only when it rises to
the level of "permeat[ing] the workplace with *discriminatory* intimidation, ridicule, and insult
that is sufficiently severe or pervasive to alter the conditions of the victim's employment," and
thereby constitutes a hostile work environment.  *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C.
Cir. 2002) (emphasis added) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347–48 (D.C. Cir.
1999).  A hostile work environment claim is "a special type of retaliation claim," which "consists
of several individual acts that 'may not be actionable on [their] own' but become actionable due
to their 'cumulative effect.'"  *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (quoting
*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).  Significantly, "Title VII does
not prohibit all verbal or physical harassment in the workplace," *Oncale v. Sundowner Offshore
Servs., Inc.*, 523 U.S. 75, 80 (1998), and "Title VII is aimed at preventing discrimination, not
auditing the responsiveness of human resources departments," *Baird*, 792 F.3d at 168–69.

Here, the plaintiff's allegations, "consist of occasional name-calling, rude emails, lost tempers and workplace disagreements—the kind of conduct that courts frequently deem uncognizable under Title VII," *id.* at 171 (collecting cases), and "[t]he sheer volume of [the plaintiff]'s allegations does not change [the] conclusion:  a long list of trivial incidents is no more a hostile work environment than a pile of feathers is a crushing weight," *id.* at 172. Moreover, the plaintiff's allegations lack any indication that any "bullying," intimidation, ridicule, or insult directed at her was in any way *discriminatory*, *i.e.*, based on the plaintiff's race or other protected status.  In fact, only one of her allegations, buried in an exhibit to her opposition, potentially alludes to the plaintiff's race, *see* Pl.'s Opp'n, Ex. O at 1 (accusing the defendant of "mocking Plaintiff's accent"), and the plaintiff makes no allegation at all linking any harassment to her whistleblower status, which status the plaintiff obtained at least five years before she began working under the defendant's supervision.  *See* Pl.'s Opp'n at 3–5 (explaining that the plaintiff became a whistleblower "around April 2003" and that the defendant became the plaintiff's supervisor in December 2008).  Accordingly, the plaintiff's claims for harassment, to the extent that she alleges such claims constitute a hostile work environment, must be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss, ECF No. 4, is granted and the plaintiff's claims are dismissed.  The Clerk of the United States District Court for the District of Columbia is directed to close this case.

An Order consistent with the Memorandum Opinion will be issued contemporaneously.

Date:  February 29, 2016

_____
BERYL A. HOWELL
United States District Judge